**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | |
|---|---|
| MYMAIL, LTD., | |
| *Plaintiff*, | |
| v. | Case No. 2:16-cv-01000-JRG-RSP |
| YAHOO! INC., | |
| *Defendant*. | |

## CLAIM CONSTRUCTION MEMORANDUM OPINION AND ORDER

Before the Court is the opening claim construction brief of MyMail, Ltd. ("Plaintiff") (Dkt. No. 95, filed on July 5, 2017),[1] the response of Yahoo Holdings, Inc. ("Defendant") (Dkt. No. 111, filed on July 26, 2017), and the reply of Plaintiff (Dkt. No. 116, filed on August 7, 2017). The Court held a hearing on the issues of claim construction and claim definiteness on August 30, 2017. Having considered the arguments and evidence presented by the parties at the hearing and in their briefing, the Court issues this Order.

---

[1] Citations to the parties' filings are to the filing's number in the docket (Dkt. No.) and pin cites are to the page numbers assigned through ECF.

**Table of Contents**

I.     BACKGROUND ...................................................................................... 3

II.     LEGAL PRINCIPLES ............................................................................ 5

     A.     Claim Construction ...................................................................... 5

     B.     Departing from the Ordinary Meaning of a Claim Term........................................ 8

     C.     Definiteness Under 35 U.S.C. § 112, ¶ 2 (pre-AIA) / § 112(b) (AIA) ................... 9

III.     CONSTRUCTION OF DISPUTED TERMS....................................................... 10

     A.     "toolbar-defining databases," "toolbar," "database," and "toolbar data" ............. 10

     B.     Determining Terms ................................................................... 17

     C.     "invoking"............................................................................... 20

     D.     "updating the toolbar data" and "updating of the updated toolbar data"............. 22

     E.     "user" .................................................................................. 25

     F.     The Information-Associated-With Terms........................................... 28

IV.     CONCLUSION ...................................................................................... 32

# I.     BACKGROUND

Plaintiff alleges infringement of U.S. Patent No. 9,021,070 (the '070 Patent). The '070 Patent is entitled Dynamically Modifying a Toolbar. The application leading to the '070 Patent was filed on June 20, 2013 and the patent issued on April 28, 2015. The patent claims priority to a provisional application filed on June 19, 1997 through a series of continuation and division applications.

The '070 Patent is generally directed to technology for improving network access. The claims of the '070 Patent are more specifically directed to dynamically modifying a toolbar.

The abstract of the '070 Patent provides:

The present invention comprises a method of and apparatus for simplifying the process of access to a network for a roaming computer user, divides the responsibility of servicing a given user wanting to access the network between multiple parties and minimizes the possibility of improper dissemination of email header data as well as improper use of network resources (including server systems) by non-clients.

Claim 1 of the '070 Patent, an exemplary method claim, recites as follows:

1. A method for dynamically modifying a toolbar, the method comprising:

displaying the toolbar, at a user Internet device, that includes one or more toolbar buttons, the toolbar defined by toolbar data stored in one or more toolbar-defining databases, the toolbar data comprising a plurality of toolbar button attributes associated with the one or more toolbar buttons of the toolbar, wherein at least one of the plurality of toolbar button attributes identifies a function to be performed by a specific toolbar button upon actuation of the specific toolbar button;

invoking, from the user Internet device without user intervention, communication of information associated with the one or more toolbar-defining databases to a server associated with a network address;

receiving, at the server, the information associated with the one or more toolbar-defining databases;

determining, based on the information associated with the one or more toolbar-defining databases, that the user Internet device should receive updated toolbar data;

receiving, at the user Internet device, the updated toolbar data in response to determining that the user Internet device should receive the updated toolbar data;

initiating, at the user Internet device and without user interaction, an operation to update the toolbar data in accordance with the received updated toolbar data;

updating the toolbar data at the user Internet device based on the operation and in accordance with the updated toolbar data, thereby updating the toolbar data, the updating comprising at least one member of a group comprising (a) and (b):

(a) updating the toolbar data to include at least one new attribute of the toolbar data to change the toolbar by adding a toolbar button to the toolbar; and

(b) updating the toolbar data to modify an attribute of at least one of the one or more toolbar buttons of the toolbar; and

displaying at the user Internet device the toolbar as defined by the updated toolbar data,

wherein the information associated with the toolbar data includes at least one member of a group comprising a revision level, version, time, date, user ID, account owner ID, PAP ID, IP address, session keys, billing data, name, address, account information, connection history, procedures performed by a user, group ID, e-mail address, e-mail ID, e-mail password, residential address, and phone number.

## II.   LEGAL PRINCIPLES

### A.   Claim Construction

"It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'" *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) (quoting *Innova/Pure Water Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)). To determine the meaning of the claims, courts start by considering the intrinsic evidence. *Id.* at 1313; *C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 861 (Fed. Cir. 2004); *Bell Atl. Network Servs., Inc. v. Covad Commc'ns Group, Inc.*, 262 F.3d 1258, 1267 (Fed. Cir. 2001). The intrinsic evidence includes the claims themselves, the specification, and the prosecution history. *Phillips*, 415 F.3d at 1314; *C.R. Bard, Inc.*, 388 F.3d at 861. The general rule—subject to certain specific exceptions discussed *infra*—is that each claim term is construed according to its ordinary and accustomed meaning as understood by one of ordinary skill in the art at the time of the invention in the context of the patent. *Phillips*, 415 F.3d at 1312–13; *Alloc, Inc. v. Int'l Trade Comm'n*, 342 F.3d 1361, 1368 (Fed. Cir. 2003); *Azure Networks, LLC v. CSR PLC*, 771 F.3d 1336, 1347 (Fed. Cir. 2014) ("There is a heavy presumption that claim terms carry their accustomed meaning in the relevant community at the relevant time.") (vacated on other grounds).

"The claim construction inquiry . . . begins and ends in all cases with the actual words of the claim." *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1248 (Fed. Cir. 1998). "[I]n all aspects of claim construction, 'the name of the game is the claim.'" *Apple Inc. v. Motorola, Inc.*, 757 F.3d 1286, 1298 (Fed. Cir. 2014) (quoting *In re Hiniker Co.*, 150 F.3d 1362, 1369 (Fed. Cir. 1998)). First, a term's context in the asserted claim can be instructive. *Phillips*, 415 F.3d at 1314. Other asserted or unasserted claims can also aid in determining the claim's meaning, because

claim terms are typically used consistently throughout the patent. *Id.* Differences among the claim terms can also assist in understanding a term's meaning. *Id.* For example, when a dependent claim adds a limitation to an independent claim, it is presumed that the independent claim does not include the limitation. *Id.* at 1314–15.

"[C]laims 'must be read in view of the specification, of which they are a part.'" *Id.* (quoting *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995) (en banc)). "[T]he specification 'is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term.'" *Id.* (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)); *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1325 (Fed. Cir. 2002). But, "'[a]lthough the specification may aid the court in interpreting the meaning of disputed claim language, particular embodiments and examples appearing in the specification will not generally be read into the claims.'" *Comark Commc'ns, Inc. v. Harris Corp.*, 156 F.3d 1182, 1187 (Fed. Cir. 1998) (quoting *Constant v. Advanced Micro-Devices, Inc.*, 848 F.2d 1560, 1571 (Fed. Cir. 1988)); *see also Phillips*, 415 F.3d at 1323. "[I]t is improper to read limitations from a preferred embodiment described in the specification—even if it is the only embodiment—into the claims absent a clear indication in the intrinsic record that the patentee intended the claims to be so limited." *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 913 (Fed. Cir. 2004).

The prosecution history is another tool to supply the proper context for claim construction because, like the specification, the prosecution history provides evidence of how the U.S. Patent and Trademark Office ("PTO") and the inventor understood the patent. *Phillips*, 415 F.3d at 1317. However, "because the prosecution history represents an ongoing negotiation between the PTO and the applicant, rather than the final product of that negotiation, it often lacks the clarity of the

specification and thus is less useful for claim construction purposes." *Id.* at 1318; *see also Athletic Alternatives, Inc. v. Prince Mfg.*, 73 F.3d 1573, 1580 (Fed. Cir. 1996) (ambiguous prosecution history may be "unhelpful as an interpretive resource").

Although extrinsic evidence can also be useful, it is "'less significant than the intrinsic record in determining the legally operative meaning of claim language.'" *Phillips*, 415 F.3d at 1317 (quoting *C.R. Bard, Inc.*, 388 F.3d at 862). Technical dictionaries and treatises may help a court understand the underlying technology and the manner in which one skilled in the art might use claim terms, but technical dictionaries and treatises may provide definitions that are too broad or may not be indicative of how the term is used in the patent. *Id.* at 1318. Similarly, expert testimony may aid a court in understanding the underlying technology and determining the particular meaning of a term in the pertinent field, but an expert's conclusory, unsupported assertions as to a term's definition are not helpful to a court. *Id.* Extrinsic evidence is "less reliable than the patent and its prosecution history in determining how to read claim terms." *Id.* The Supreme Court recently explained the role of extrinsic evidence in claim construction:

> In some cases, however, the district court will need to look beyond the patent's intrinsic evidence and to consult extrinsic evidence in order to understand, for example, the background science or the meaning of a term in the relevant art during the relevant time period. *See, e.g., Seymour v. Osborne*, 11 Wall. 516, 546 (1871) (a patent may be "so interspersed with technical terms and terms of art that the testimony of scientific witnesses is indispensable to a correct understanding of its meaning"). In cases where those subsidiary facts are in dispute, courts will need to make subsidiary factual findings about that extrinsic evidence. These are the "evidentiary underpinnings" of claim construction that we discussed in *Markman*, and this subsidiary factfinding must be reviewed for clear error on appeal.

*Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 135 S. Ct. 831, 841 (2015).

## B.      Departing from the Ordinary Meaning of a Claim Term

There are "only two exceptions to [the] general rule" that claim terms are construed according to their plain and ordinary meaning: "1) when a patentee sets out a definition and acts as his own lexicographer, or 2) when the patentee disavows the full scope of the claim term either in the specification or during prosecution."[2] *Golden Bridge Tech., Inc. v. Apple Inc.*, 758 F.3d 1362, 1365 (Fed. Cir. 2014) (quoting *Thorner v. Sony Computer Entm't Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012)); *see also GE Lighting Solutions, LLC v. AgiLight, Inc.*, 750 F.3d 1304, 1309 (Fed. Cir. 2014) ("[T]he specification and prosecution history only compel departure from the plain meaning in two instances: lexicography and disavowal."). The standards for finding lexicography or disavowal are "exacting." *GE Lighting Solutions*, 750 F.3d at 1309.

To act as his own lexicographer, the patentee must "clearly set forth a definition of the disputed claim term," and "clearly express an intent to define the term." *Id.* (quoting *Thorner*, 669 F.3d at 1365); *see also Renishaw*, 158 F.3d at 1249. The patentee's lexicography must appear "with reasonable clarity, deliberateness, and precision." *Renishaw*, 158 F.3d at 1249.

To disavow or disclaim the full scope of a claim term, the patentee's statements in the specification or prosecution history must amount to a "clear and unmistakable" surrender. *Cordis Corp. v. Boston Sci. Corp.*, 561 F.3d 1319, 1329 (Fed. Cir. 2009); *see also Thorner*, 669 F.3d at 1366 ("The patentee may demonstrate intent to deviate from the ordinary and accustomed meaning of a claim term by including in the specification expressions of manifest exclusion or restriction, representing a clear disavowal of claim scope."). "Where an applicant's statements are amenable

---

[2] Some cases have characterized other principles of claim construction as "exceptions" to the general rule, such as the statutory requirement that a means-plus-function term is construed to cover the corresponding structure disclosed in the specification. *See, e.g., CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1367 (Fed. Cir. 2002).

to multiple reasonable interpretations, they cannot be deemed clear and unmistakable." *3M Innovative Props. Co. v. Tredegar Corp.*, 725 F.3d 1315, 1326 (Fed. Cir. 2013).

## C.  Definiteness Under 35 U.S.C. § 112, ¶ 2 (pre-AIA) / § 112(b) (AIA)[3]

Patent claims must particularly point out and distinctly claim the subject matter regarded as the invention. 35 U.S.C. § 112, ¶ 2. A claim, when viewed in light of the intrinsic evidence, must "inform those skilled in the art about the scope of the invention with reasonable certainty." *Nautilus Inc. v. Biosig Instruments, Inc.*, 134 S. Ct. 2120, 2129 (2014). If it does not, the claim fails § 112, ¶ 2 and is therefore invalid as indefinite. *Id.* at 2124. Whether a claim is indefinite is determined from the perspective of one of ordinary skill in the art as of the time the application for the patent was filed. *Id.* at 2130. As it is a challenge to the validity of a patent, the failure of any claim in suit to comply with § 112 must be shown by clear and convincing evidence. *Id.* at 2130 n.10. "[I]ndefiniteness is a question of law and in effect part of claim construction." *ePlus, Inc. v. Lawson Software, Inc.*, 700 F.3d 509, 517 (Fed. Cir. 2012).

When a term of degree is used in a claim, "the court must determine whether the patent provides some standard for measuring that degree." *Biosig Instruments, Inc. v. Nautilus, Inc.*, 783 F.3d 1374, 1378 (Fed. Cir. 2015) (quotation marks omitted). Likewise, when a subjective term is used in a claim, "the court must determine whether the patent's specification supplies some standard for measuring the scope of the [term]." *Datamize, LLC v. Plumtree Software, Inc.*, 417 F.3d 1342, 1351 (Fed. Cir. 2005). The standard "must provide objective boundaries for those of skill in the art." *Interval Licensing LLC v. AOL, Inc.*, 766 F.3d 1364, 1371 (Fed. Cir. 2014).

---

[3] The Court refers to the pre-AIA version of § 112 but understands that there is no substantial difference between definiteness under the pre-AIA version and under the AIA version of the statute.

## III.    CONSTRUCTION OF DISPUTED TERMS

### A.    "toolbar-defining databases," "toolbar," "database," and "toolbar data"

| Disputed Term[4] | Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|---|
| toolbar-defining databases<br><br>• Claims 1, 9, 17 | databases storing information related to toolbar creation and modification | See proposed constructions for "toolbar" and "database" |
| toolbar<br><br>• Claims 1, 9, 17 | a display of a button bar generated by the operation of software using information received from one or more toolbar-defining databases | customized button bar that is dynamically changed or updated via a Pinger process or a MOT script and through which all functions of a button bar database may be initiated |
| database<br><br>• Claims 1, 9 | plain and ordinary meaning (i.e., "a comprehensive collection of related data organized for convenient access . . .") | body of information that is held within a computer system using the facilities of a database management system |
| toolbar data<br><br>• Claims 1, 9, 17 | information related to toolbar creation and modification | information that identifies content and/or describes functions used in generating a toolbar |

Because the parties' arguments and proposed constructions with respect to these terms are

related, the Court addresses the terms together.

### The Parties' Positions

Plaintiff submits: The '070 Patent equates "button bar" and "toolbar," thereby equating

"button bar database" and "toolbar-defining database," and describes the button bar database as a

---

[4] For all term charts in this order, the claims in which the term is found are listed with the term but: (1) only the highest-level claim in each dependency chain is listed, and (2) only asserted claims identified in the parties' Joint Patent Rule 4-5(d) Claim Construction Chart (Dkt. No. 125) are listed.

database that "includes information related to button bar creation and modification." Dkt. No. 95 at 6–8 (quoting '070 Patent 10:16–17). The patent describes that the "toolbar" is generated by software using information from a tool-bar defining database. *Id.* at 17–18. Defendant's proposed construction of "toolbar" is improperly limiting in two ways. First, the "dynamically changed or updated via a Pinger process or a Mott script" are features of exemplary embodiments that should not be read into the claims. *Id.* at 8–9, 18. Second, the "through which all functions of a button bar database may be initiated" language, though stated in the patent, does not require that functions must be initiated through the toolbar as Defendant's construction suggests. *Id.* at 9. A "database" is, under its plain and ordinary meaning, simply "a comprehensive collection of related data organized for convenient access." *Id.* at 13 (quoting *Random House Webster's Unabridged Dictionary* 508 (2d ed. 2001)). Defendant's proposed construction of "database" is improperly limiting in that it requires a "database management system," a feature not mentioned in the patent. *Id.* at 9–10, 13. Finally, "toolbar data" refers to the information stored in the toolbar-defining database, that is, the information related to the toolbar creation and modification. *Id.* at 18–19.

In addition to the claims themselves, Plaintiff cites the following intrinsic and extrinsic evidence to support its position: **Intrinsic evidence**: '070 Patent fig.17, 7:48–52, 9:29–48, 9:52–11:31. **Extrinsic evidence**: *Random House Webster's Unabridged Dictionary* (2d ed. 2001) (defining "database") (Def.'s Ex. 3, Dkt. No. 111-4).

Defendant responds: There is no need to construe "toolbar-defining database" apart from "toolbar" and "database." Dkt. No. 111 at 3–4. And to the extent such a construction is warranted, Plaintiff's proposed construction fails to capture the meaning of "defining" and would improperly expand "toolbar-defining database" to include information that does not define a toolbar. *Id.* at 4. As stated in the '070 Patent, "[t]he Toolbar of ***the present invention*** has some unique properties

as it can be dynamically changed or updated via a Pinger process or a MOT script. *Id.* at 15 (quoting '070 Patent 10:24–26 (emphasis by Defendant)). The Pinger-process and MOT-script update capability is a distinguishing (unique) characteristic of the present invention and is present in every exemplary embodiment; thus, it is an inherent characteristic of the "toolbar" of the claims. *Id.* 15–17. The patent also states that "[a]ll functions" of the button bar database "may be initiated through" the toolbar. *Id.* at 15 (quoting '070 Patent 10:16–21). This does not mean that the functions *must be* initiated through the toolbar. *Id.* at 18. "Database" in the patent and in the art refers to information managed with a database management system such as the "client dispatch application" described in the patent. *Id.* at 5–7. Plaintiff's proposed construction improperly relies upon a general-purpose dictionary that postdates the priority date of the patent, fails to incorporate that the database information is "generally in a computer" as defined in that dictionary, and includes a "comprehensive" limitation the contradicts the use of "database" in the patent and in Plaintiff's proposed construction of "toolbar" allowing for "one or more" databases. *Id.* at 7–9, 18. "Toolbar data" is described in the patent as information used to identify content or functions that are in turn used to generate the toolbar, as Plaintiff agreed in previous litigation over a related patent. *Id.* at 19–20 (citing Joint Claim Construction and Prehearing Statement, *MyMail, Ltd. v. Conduit, Ltd. et al.*, No. 2:13-cv-961 (E.D. Tex. Dec. 11, 2014), Dkt. No. 97). Finally, Plaintiff's proposed construction improperly encompasses information that is related to toolbar creation or modification but is not used for toolbar creation or modification. *Id.* at 20–21.

In addition to the claims themselves, Defendant cites the following intrinsic and extrinsic evidence to support its position: **Intrinsic evidence**: '070 Patent figs.2 & 17, 4:33–35, 6:40–47, 9:29–10:26, 10:41–44, 10:46–11:23, 11:60–12:2, 12:23–54, 12:58–60, 13:12–16, 16:58–61, 20:42–44, 29:23–26; '070 Patent File Wrapper Application Appendix A (Def.'s Ex. 4, Dkt. No.

111-5). **Extrinsic evidence**: *A Dictionary of Computing* (4th ed. 1997) (defining "database") (Def.'s Ex. 1, Dkt. No. 111-2); *Random House Webster's Unabridged Dictionary* (2d ed. 2001) (defining "database") (Def.'s Ex. 3, Dkt. No. 111-4).

Plaintiff replies: The patent describes that toolbar data is: (1) used to build the toolbar and (2) stored in toolbar-defining databases. Dkt. No. 116 at 2–3. Pinger-process and MOT-script update capability are features of an embodiment and "are not meant to be construed in a limiting sense." *Id.* at 8 (quoting '070 Patent 29:27–32). Databases in the patent are not described with respect to a database management system, and the client dispatch application is not described as managing the databases, but rather using information from the databases. *Id.* at 4–5. Finally, the agreed construction of "toolbar data" in a related patent was never adopted by the Court in the *Conduit* case and is not binding here. *Id.* at 8–9.

Plaintiff cites further **intrinsic evidence** to support its position: '070 Patent 11:13–15, 12:8–9, 13:1–16, 22:6, 29:27–32.

<u>**Analysis**</u>

There are four issues in dispute: (1) whether a "toolbar" necessarily is updated via a Pinger process or MOT script; (2) whether a "toolbar" necessarily allows access to all functions of a button bar database; (3) whether a "toolbar-defining database" necessarily involves a database management system; and (4) whether "toolbar data" is simply related to generating a toolbar or rather identifies or describes information used to generate a toolbar. With respect to the first issue, a "toolbar" of the invention can be updated via a Pinger process or MOT scripts, but this does not preclude other update processes. As to the second issue, a toolbar does not necessarily provide access to all functions of a button bar database. With respect to the third issue, while a "database"

in the '070 Patent is accessible by software processes, the meaning of "database management system" is not clear and the Court declines to insert such a limitation into the construction. Concerning the fourth issue, "toolbar data" is used to build toolbars.

The "toolbar" of the invention of the '070 Patent is not a generic toolbar. Specifically, the patent explains:

> The button bar database 208 includes information related to button bar creation and modification. ***All functions may be initiated through the human interface--a Toolbar*** <u>***(also described in the art as a button bar and basic examples of which may be found in many present day computer applications)***</u>. Software responsive to the button bar database 208, for displaying the Toolbar in accordance with data in the button bar database 208, may be provided as part of a network browser. ***The Toolbar of the present invention has some unique properties as it can be dynamically changed or updated via a Pinger process or a MOT script***. As defined in this application and as will be described in more detail later, a Pinger process comprises an entity that acts transparently as a "services" coordinator to provide and/or administer the following: 1. Heartbeat service to help maintain network connectivity with a client. 2. Authentication services that securely authenticate client access to email, commerce, and other public and private network servers and services. 3. Update services that can perform client software, database, and maintenance services during periods of inactivity.

'070 Patent 10: 16–26 (emphasis added). That is, the "toolbar of the *present invention*" is described in part by its ability to be updated via a Pinger Process or a MOT script. Indeed, in the description of the exemplary embodiments, the toolbar always has this ability. This is definitional. *See Absolute Software, Inc. v. Stealth Signal, Inc.*, 659 F.3d 1121, 1136 (Fed. Cir. 2011) ("a patentee's consistent reference to a certain limitation or a preferred embodiment as 'this invention' or the 'present invention' can serve to limit the scope of the entire invention, particularly where no other intrinsic evidence suggests otherwise"). There is a profound difference, however, between the plain language of this definition, a toolbar that "*can be* dynamically changed or updated via a

Pinger process or a MOT script" and what Defendant proposes, a toolbar "*that is* dynamically changed or updated via a Pinger process or a MOT script." Defendant's limitation is not supported.

While the "updating" statement is definitional, the "all functions may be initiated statement" is not. Indeed, the statement includes reference to generic toolbars and does not reference the "present invention." Thus, the statement describes a feature of the exemplary embodiment being described, not at an innate aspect of the invention. It is not limiting.

The "toolbar-defining database," and the other databases of the '070 Patent, are not defined with respect to a database management system. To begin, the '070 Patent does not describe any process or application that accesses or updates the exemplary databases as a database management system. Further, Defendant fails to explain what constitutes a database management system, but rather points to one exemplary application, the client dispatch application, as a database management system. But this application does not appear to fit the definition of database management system as provided in Defendant's proffered dictionary. Specifically, the dictionary provides in the "strict" definition of database that "[a]ll accessing and updating of [database] information will be via" the database management system. *A Dictionary of Computing* 119 (4th ed. 1997), Dkt. No. 111-2 at 4. And the databases of the patent are described as updated by a Pinger process or, *alternatively*, a MOT script. *See, e.g.,* '070 Patent 11:60–12:54. That is, there are multiple applications through which the databases may be accessed or updated. This suggests that "database" in the patent is used in a less "strict" sense to refer to "a collection of data on some subject however defined, accessed, and stored within a computer system." *A Dictionary of Computing* 119 (4th ed. 1997), Dkt. No. 111-2 at 4. For the "toolbar-defining database," the subject matter is self-apparent—defining toolbars.

The "toolbar data" is not just related to the creation or modification of the toolbar, it is definitional of the toolbar. It is used to create or modify the toolbar. Indeed, the toolbar data is in large part defined in the claims themselves. For example, Claim 1 provides:

> the *toolbar defined by toolbar data* stored in one or more toolbar-defining databases, the *toolbar data comprising* a plurality of toolbar button attributes associated with the one or more toolbar buttons of the tool bar, wherein at least one of the plurality of tool bar button attributes identifies a function to be performed by a specific toolbar button upon actuation of the specific toolbar button.

'070 Patent 29:45–50 (emphasis added). The toolbar data defines the toolbar and includes button-attribute information. Claims 9 and 17 have similar recitations defining the toolbar data. *Id.* at 31:44–51, 32:45–53. Simply, the toolbar data is data that is used to generate the toolbar.

Accordingly, the Court construes "toolbar-defining databases," "toolbar," "database," and "toolbar data" as follows:

- "toolbar-defining databases" means "databases that include information used to create or modify a toolbar";

- "toolbar" means "button bar that can be dynamically changed or updated via a Pinger process or a MOT script";

- "database" means "collection of related information that is stored and accessed on a computer"; and

- "toolbar data" means "information used to create or modify the toolbar."

### B. Determining Terms

| Disputed Term | Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|---|
| determining, based on the information associated with the one or more toolbar-defining databases, that the user Internet device should receive updated toolbar data<br><br>• Claim 1 | No construction necessary beyond "toolbar-defining databases" and "toolbar data" | determining, based on review of the information associated with the one or more toolbar-defining databases, that the toolbar at the user Internet device is out of date and needs to be updated |
| determining that the user Internet device should receive the updated toolbar data<br><br>• Claims 1, 17 | No construction necessary beyond and "toolbar data" | determining, based on review of the information associated with the one or more toolbar-defining databases, that the toolbar at the user Internet device is out of date and needs to be updated |
| determining, based on the information associated with the toolbar data stored in the one or more toolbar-defining databases of the user Internet device, that the user Internet device should receive updated toolbar data<br><br>• Claim 9 | No construction necessary beyond "toolbar-defining databases" and "toolbar data" | determining, based on review of the information associated with the toolbar data stored in the one or more toolbar-defining databases, that the toolbar at the user Internet device is out of date and needs to be updated |
| determine that the user Internet device should receive updated toolbar data.<br><br>• Claim 17 | No construction necessary beyond "toolbar data" | determine, based on review of the information associated with the toolbar data stored in the one or more toolbar-defining databases, that the toolbar at the user Internet device is out of date and needs to be updated |

Because the parties' arguments and proposed constructions with respect to these terms are related, the Court addresses the terms together.

### The Parties' Positions

Plaintiff submits: These terms do not need to be construed beyond the constituent terms that are separately being construed. Dkt. No. 95 at 10. Dkt. No. 95 at 14–15. Defendant's proposed construction improperly injects "the toolbar at the user Internet device is out of date and needs to be updated." *Id.* at 14–15. This additional limitation is unfounded in the claims or the description—which allows that the toolbar may be updated for reasons other than being out of date, such as to add a button. *Id.*

In addition to the claims themselves, Plaintiff cites the following **intrinsic evidence** to support its position: '070 Patent 10:24–26.

Defendant responds: The '070 Patent describes that toolbars are updated only when necessary, i.e., when they are "out of date." Dkt. No. 111 at 10–11. It may be that the update is to add a button, but the button is added only when the toolbar is out of date. *Id.* at 11. The terms must be construed to give effect to "update," and not cover just any situation in which a server determines it should send information to a client. *Id.* at 11.

In addition to the claims themselves, Defendant cites the following **intrinsic evidence** to support its position: '070 Patent 12:32–35, 17:48–52, 20:7–10.

Plaintiff replies: The meanings of these terms are clear without construction, other than the constituent terms that are separately being construed, and do not encompass just any situation in which a server determines it should send information to a client. Dkt. No. 116 at 5–6. But there is no support in the patent that determining whether to update the toolbar data requires determining whether the toolbar is out of date. *Id.* at 5.

**<u>Analysis</u>**

The issue in dispute is whether determining whether to update toolbar data necessarily entails determining whether the toolbar is "out of date." The Court declines to read in an "out of date" limitation because such a limitation does not clarify claim scope and threatens to improperly change claim scope.

The meaning of "out of date," as Defendant is using it, is not clear to the Court. Plainly, something (e.g., a toolbar) is "updated" when it is changed to incorporate new information. But it is not clear whether the existence of new information means that the something (the toolbar) is "out of date." If it does, then "out of date" adds nothing to "update." But "out of date" threatens other meanings that are improper in the context of the '070 Patent. Specifically, does "out of date" suggest that the toolbar is expired, that it is no longer good or useable or suitable because it is too old? Does this mean that "determining" whether to update toolbar data necessarily entails time or date comparisons? Rather, the '070 Patent suggests updates may be based on location. *See, e.g.*, '070 Patent 26:66–27:27 (noting a special configuration of the toolbar if the "client were traveling away from home"). Ultimately, Defendant's proposed "out of date" limitations threatens to obfuscate rather than clarify claim scope.

Accordingly, the Court rejects Defendant's "that the toolbar at the user Internet device is out of date and needs to be updated" limitation and determines that the Determining Terms have their plain and ordinary meaning, subject to the constructions of their constituent terms that are before the Court, and need no further construction.

### C. "invoking"

| Disputed Term | Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|---|
| "invoking"<br><br>• Claims 1, 17 | plain and ordinary meaning (i.e. "to start a command, procedure, or program.") | indefinite |

Because the parties' arguments and proposed constructions with respect to these terms are related, the Court addresses the terms together.

**The Parties' Positions**

Plaintiff submits: The plain meaning of "invoke" in the art is to "start a command, procedure, or program." Dkt. No. 95 at 16 (quoting *IBM Dictionary of Computing* 358 (10th ed. 1993)[5]). In the '070 Patent's description of exemplary embodiments, starting a procedure is described as "initiating." *Id.* at 16–17. Thus, for example, invoking communication, as in Claims 1 and 17, means initiating communication. *Id.*

In addition to the claims themselves, Plaintiff cites the following intrinsic and extrinsic evidence to support its position: **Intrinsic evidence**: '070 Patent 12:23–35. **Extrinsic evidence**: *IBM Dictionary of Computing* (10th ed. 1993) (defining "invoke").

Defendant responds: Because "invoking" is recited as a separate step from "communicating" in Claim 17, invoking communication is distinct from communicating. Dkt. No. 111 at 12. But Claim 1, which does not separately recite "communicating," is inoperable unless invoking communication is communicating. *Id.* It is also unclear whether "invoking, from the user Internet device . . . communication . . . to a server" means that the invoking or the communication is from

---

[5] The parties did not provide the Court with a copy of this dictionary entry. Defendant, however, has not challenged the accuracy of Plaintiff's representation of the dictionary definition.

the user Internet device, either of which interpretation is supported by the patent's disclosure. *Id.* at 12–14. Finally, communication is necessarily initiated so interpreting "invoking" communication as "initiating" communication, as Plaintiff argues, would read "invoking" out of the claims. *Id.* at 14.

In addition to the claims themselves, Defendant cites the following **intrinsic evidence** to support its position: '070 Patent 11. 47–49, 12:8–11, 12: 23–35, 15:12–16:4–7.

Plaintiff replies: Under the plain meaning of the claim language, and the description of the exemplary embodiments, "invoking, from the user Internet device . . .communication . . . to a server" means that the "invoking" is from the user Internet device. Dkt. No. 116 at 6–7.

**Analysis**

The issue in dispute is whether the use of "invoking … communication" in the claims renders and claim indefinite. It does not.

In the context of the '070 Patent, "invoking" plainly means causing or initiating something to happen. This may, as Plaintiff's extrinsic evidence suggests, involve starting a process. So, "invoking" communication means causing, or starting, or initiating communication. *See, e.g.,* '070 Patent 6:64–66 ("the client dispatch application 200 causes the user 110 to automatically transmit access information to the predetermined ISP 102), 17: 39–42 ("a 'pinger' function is initiated as discussed previously. The pinger function causes the client dispatch application 200 to transmit header information to the access service 106").

Such an understanding of "invoking" communication does not render Claim 1 inoperable. Defendant's argument that the claim is inoperable is premised on the need to list all steps necessary for operation. But Claim 1 recites a "comprising" transition phrase. '070 Patent 29:41. Thus, the

list of steps recited in the claimed method are not exhaustive. Other steps may be performed. *Invitrogen Corp. v. Biocrest Mfg., L.P.*, 327 F.3d 1364, 1368 (Fed. Cir. 2003) ("The transition 'comprising' in a method claim indicates that the claim is open-ended and allows for additional steps."). There is no need for the explicit recitation of a separate "communicating" step.

The Court does not agree that the language "invoking, from the user Internet device . . . communication . . . to a server" can reasonably be interpreted to allow that the "invoking" may be from other than the user Internet device. Whether or not the patent discloses an embodiment in which invoking communication is from other than the user Internet device, Claims 1 and 17 plainly require that the invoking be "from the user Internet device." The meaning is reasonably certain. Defendant has not proven any ambiguity that rises to the level of indefiniteness.

Accordingly, the Court determines that Defendant has failed to prove that "invoking" in the claims renders any claim indefinite.

### D.      "updating the toolbar data" and "updating of the updated toolbar data"

| Disputed Term | Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|---|
| updating the toolbar data<br><br>• Claims 1, 9, 17 | updating the toolbar data, or a portion thereof, on a user Internet device | updating a portion of the toolbar data via a Pinger process or a MOT script |
| updating of the updated toolbar data"<br><br>• Claim 15 | updating of the toolbar data, or a portion thereof, on a user Internet device that was previously updated | updating a portion of the toolbar data via a Pinger process or a MOT script |

Because the parties' arguments and proposed constructions with respect to these terms are related, the Court addresses the terms together.

**<u>The Parties' Positions</u>**

Plaintiff submits: "Toolbar data" is stored in a "toolbar-defining database" and the '070 Patent teaches that the database, and the toolbar data, may be updated in whole or in part. Dkt. No.

95 at 20–21. And the Pinger-process and MOT-script updating embodiments are exemplary, not definitional. *Id.* at 21. With respect to Claim 15, "updating of the updated toolbar data" means updating a toolbar that has previously been updated. *Id.* at 21–22.

In addition to the claims themselves, Plaintiff cites the following **intrinsic evidence** to support its position: '070 Patent 11:64–12:2, 15:1–17.

Defendant responds: The Pinger-process and MOT-script updates are unique aspects of the invention and therefore inherent in the claimed updating. Dkt. No. 111 at 22–23. Claim 15 recites, in clear language, "maintaining a display of the tool bar as defined by the updated tool bar data ***until a subsequent*** updating of the updated toolbar data." *Id.* at 23–24 (emphasis by Defendant). Plaintiff's proposed injection of "a user Internet device that was previously updated" threatens to change the meaning of Claim 15. *Id.* at 24.

In addition to the claims themselves, Defendant cites the following **intrinsic evidence** to support its position: '070 Patent 10:24–44, 11:60–62, 11:64–12:2, 12:40–54, 26:67–27:14.

Plaintiff replies: The exemplary Pinger-process and MOT-script updates should not be read into the claims. Dkt. No. 116 at 9. With respect to Claim 15, a "subsequent updating of the updated toolbar data" requires that the "updated toolbar data" was previously updated. *Id.*

### **Analysis**

There are two issues in dispute. First, whether "updating" toolbar data necessarily entails use of a Pinger process or a MOT script. It does not. Second, whether "updating" toolbar data is necessarily limited to updating only a portion of the toolbar data. It is not.

As discussed above, the "toolbar" of the claimed invention necessarily "*can be* dynamically changed or updated via a Pinger process or a MOT script." '070 Patent 10:16–26 (emphasis added). But the toolbar, or the toolbar data, is not defined such that it *must be* updated via a Pinger process

or a MOT script. The Court declines to interpret *can be* in the definitional statement of the "present invention" as "*must be*." And even if, as Defendant contends, all the exemplary embodiments of updating toolbar data involve Pinger-process or MOT-script updating, that alone is not enough to limit the claims to require that updating *must be* via a Pinger process or MOT script. *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1323 (Fed. Cir. 2005) (en banc) ("we have expressly rejected the contention that if a patent describes only a single embodiment, the claims of the patent must be construed as being limited to that embodiment"); *Thorner v. Sony Comput. Entm't Am. LLC*, 669 F.3d 1362, 1366 (Fed. Cir. 2012) ("It is likewise not enough that the only embodiments, or all of the embodiments, contain a particular limitation. We do not read limitations from the specification into claims; we do not redefine words. Only the patentee can do that."); *SRI Int'l v. Matsushita Elec. Corp.*, 775 F.2d 1107, 1121 (Fed. Cir. 1985) (en banc) ("The law does not require the impossible. Hence, it does not require that an applicant describe in his specification every conceivable and possible future embodiment of his invention."). Thus, the claims are not implicitly limited to Pinger-process or MOT-script updating.

It is not clear that there is a dispute regarding whether updating is limited to a "portion" of the toolbar data that is necessarily less than all the toolbar data. Defendant has not provided sufficient evidence or argument to support such a limitation in any event.

While there does not seem to be any articulated dispute regarding Plaintiff's proposed "on a user Internet device" limitation, the Court declines to include the limitation. Specifically, Claims 1 and 17 explicitly recite "updating the toolbar data at the user Internet device" and Claim 9 recites that the "toolbar data" is "stored in … databases of the user Internet device." '070 Patent 29:66, 31:45–46, 33:1. The Court sees no reason to inject "on a user Internet device" into the Updating Terms.

Accordingly, the Court construes "updating the toolbar data" and "updating of the updated toolbar data" as follows:

- "updating the toolbar data" means "updating the toolbar data, or a portion thereof";

- "updating of the updated toolbar data" means "updating of the previously updated toolbar data, or a portion thereof."

### E.    "user"

| Disputed Term | Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|---|
| user<br><br>• Claims 1, 9, 17 | person, entity, or computer system | roaming person using a computer |

Because the parties' arguments and proposed constructions with respect to these terms are related, the Court addresses the terms together.

**The Parties' Positions**

Plaintiff submits: The '070 Patent provides that a "user" may "include a single computer, group of computers, local area network, or a larger network," thus a "user" may be a computer system. Dkt. No. 95 at 22–23 (quoting '070 Patent 6:30–34). The patent also provides that a "user" may "click[] on one of the Toolbar functions," thus a "user" may be a person. *Id.* at 23 (quoting '070 Patent 11:5–6). The patent provides that a "user" may be "a network of users having a common factor such as an [] employer," thus a "user" may be an entity. *Id.* (quoting '070 Patent 29: 32–36). And the patent's disclosure does not support Defendant's proposed "roaming" limitation. *Id.* at 24.

In addition to the claims themselves, Plaintiff cites the following **intrinsic evidence** to support its position: '070 Patent 6:30–34, 9:11–13, 9:34–39, 11:5–6, 13:23–25, 29:32–36.

Defendant responds: The "present invention" of the '070 Patent expressly relates to a "roaming computer user," thus the "user" of the claims is a "roaming" user. Dkt. No. 111 at 24. The "user" of the claims is distinct from computer systems such as the claim-recited "user Internet device" and "server." *Id.* at 24–25. For example, recitations to computer processes that operate "without user intervention" only make sense if the user is a person, and not a computer system. *Id.* at 25.

In addition to the claims themselves, Defendant cites the following **intrinsic evidence** to support its position: '070 Patent, at [57] Abstract, 2:60–61, 3:33–41, 3:52–54, 27:2–11.

Plaintiff replies: A reference to a feature of the "present invention" is not limiting when other portions of the description do not support limiting the claims to require the feature. Dkt. No. 116 at 9–10. And the '070 Patent provides examples of users other than roaming users that are persons. *Id.*

**<u>Analysis</u>**

There are two issues in dispute. First, whether a "user" is necessarily a person. Second, whether a "user" is necessarily roaming. A "user" is neither necessarily a person nor roaming.

The '070 Patent uses "user" to inclusively denote persons, groups, and computers. For example, the patent provides: "Most users do not have the expertise to connect their computers and associated equipment to the Internet and/or finances to have a continuous connection to the Internet." '070 Patent 1:58–61. Thus, the user may be a person. It also provides: "The user 110 may include a single computer, group of computers, local area network, or a larger network connected to the ISP 102 via a communications link. However, in most applications, the user 110 will include a single user requesting access time to the Internet 100." *Id.* at 6:30–34. And it provides: "The user 110 may be a computer system that includes the client dispatch application 200 and the computer's

operating system 202, as well as a registry or initialization file(s) 212, a physical adaptor file(s) 214, and a protocol file(s) 216." *Id.* at 9:11–14. Thus, while a "user" may be a person, it is not necessarily a person.

While a goal of the invention of the '070 Patent may be to ease network access for roaming users, the claimed invention is not limited to such use. The patent provides multiple goals for the invention, for example: (1) "simplifying the process of access to a network for a roaming computer user," (2) "divid[ing] the responsibility of servicing a given user wanting to access the network between multiple parties," and (3) "minimiz[ing] the possibility of improper dissemination of email header data as well as improper use of network resources (including server systems) by non-clients." '070 Patent, at [57] Abstract. But these goals are not definitional of the invention. *See E-Pass Techs., Inc. v. 3COM Corp.*, 343 F.3d 1364, 1370 (Fed. Cir. 2003) ("The court's task is not to limit claim language to exclude particular devices because they do not serve a perceived 'purpose' of the invention. Rather, the district court's function is to interpret claims according to their plain language unless the patentee has chosen to be his own lexicographer in the specification or has clearly disclaimed coverage during prosecution."). Indeed, the description of an exemplary embodiment of a toolbar according to the invention explains that: "[i]f a client were traveling away from home" then the toolbar would display certain features. *Id.* at 26:66–27:14. That is, *if* the user was roaming, then the toolbar would be configured a certain way. This suggests that the user is not necessarily roaming. Further, given that the patent expressly provides that the user may be "local area network, or a larger network," it is difficult to imagine such a user roaming. *Id.* at 6:30–34. Simply, the intrinsic record does not support, let alone mandate, interpreting "user" as a "roaming person."

Accordingly, the Court construes "user" as follows:

- "user" means "person, group, or computer system."

## F.    The Information-Associated-With Terms

| Disputed Term | Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|---|
| "the information associated with the toolbar data"<br><br>• Claim 1 | no construction necessary, the antecedent basis is "information associated with the one or more toolbar-defining databases" | indefinite |
| "the information associated with the toolbar data"<br><br>• Claim 9 | no construction necessary, the antecedent basis is "information associated with the toolbar data stored in the one or more toolbar-defining databases" | indefinite |

Because the parties' arguments and proposed constructions with respect to these terms are related, the Court addresses the terms together.

### The Parties' Positions

Plaintiff submits: These terms do not need to be construed beyond the constituent terms that are separately being construed. Dkt. No. 95 at 24. In fact, the claims recite details of the "information associated with the toolbar data." *Id.* For example, Claim 1 provides:

> wherein the information associated with the toolbar data includes at least one member of a group comprising a revision level, version, time, date, user ID, account owner ID, PAP ID, IP address, session keys, billing data, name, address, account information, connection history, procedures performed by a user, group ID, e-mail address, e-mail ID, e-mail password, residential address, and phone number.

*Id.* (quoting '070 Patent 30:12–20).

Defendant responds: Claims 1 and 9 are indefinite because "the information associated with the toolbar data" recited in the claims lacks an antecedent basis. Dkt. No. 111 at 26–27. In Claim 1, the recited "information associated with the one or more toolbar-defining databases" is

not clearly the antecedent basis. *Id.* at 27–28. That is, it is possible for information to be associated with toolbar data without being associated with a toolbar-defining database, and vice versa. *Id.* With respect to Claim 9, the recited "information associated with the toolbar data stored in the one or more toolbar-defining databases" is not clearly the antecedent basis because it is unclear whether it is the "information associated" or the "toolbar data" that is "in the one or more toolbar-defining databases." *Id.* at 28.

In addition to the claims themselves, Defendant cites the following **intrinsic evidence** to support its position: '070 Patent 11:54–59, 12:24–31.

Plaintiff replies: In Claim 1, the only "information" recited in the claim before "the information associated with the toolbar data" is the "information associated with the one or more toolbar-defining databases" that is communicated to a server and the '070 Patent provides an example of such communication that includes much of the same information as is recited as included in "the information associated with the toolbar data." Dkt. No. 116 at 10–11 (citing '070 Patent 12:24–31). Thus, the antecedent basis of "the information associated with the toolbar data" is "information associated with the one or more toolbar-defining databases." *Id.* The same logic holds that in Claim 9, the antecedent basis of "the information associated with the toolbar data" is "information associated with the toolbar data stored in the one or more toolbar-defining databases."

Plaintiff cites further **intrinsic evidence** to support its position: '070 Patent 12:24–31.

**Analysis**

The issue in dispute is whether the term "the information associated with the toolbar data" render any claim indefinite. It does not.

"[T]he information associated with the toolbar data" in Claim 1 refers to the "information associated with the one or more toolbar-defining databases." Claim 1, reproduced here with emphasis by the Court, first recites an "information" limitation as "information associated with the one or more toolbar-defining databases." This is the only "information" introduced in the claim before recitation of "the information associated with the toolbar data." And the "toolbar data" of the claim is "stored in one or more toolbar defining databases." Thus, the toolbar data and the toolbar-defining database are necessarily associated one with the other by virtue of the nature of a database. In this context and based

1. A method for dynamically modifying a toolbar, the method comprising:

    displaying the toolbar, at a user Internet device, that includes one or more toolbar buttons, the toolbar defined by ***toolbar data stored in one or more toolbar-defining databases***, the toolbar data comprising a plurality of toolbar button attributes associated with the one or more toolbar buttons of the toolbar, wherein at least one of the plurality of toolbar button attributes identifies a function to be performed by a specific toolbar button upon actuation of the specific toolbar button;

    invoking, from the user Internet device without user intervention, communication of ***information associated with the one or more toolbar-defining databases*** to a server associated with a network address;

    receiving, at the server, ***the information associated with the one or more toolbar-defining databases***;

    determining, based on ***the information associated with the one or more toolbar-defining databases***, that the user Internet device should receive updated toolbar data;

    receiving, at the user Internet device, the updated toolbar data in response to determining that the user Internet device should receive the updated toolbar data;

    initiating, at the user Internet device and without user interaction, an operation to update the toolbar data in accordance with the received updated toolbar data;

    updating the toolbar data at the user Internet device based on the operation and in accordance with the updated toolbar data, thereby updating the toolbar data, the updating comprising at least one member of a group comprising (a) and (b):

    (a) updating the toolbar data to include at least one new attribute of the toolbar data to change the toolbar by adding a toolbar button to the toolbar; and

    (b) updating the toolbar data to modify an attribute of at least one of the one or more toolbar buttons of the toolbar; and displaying at the user Internet device the toolbar as defined by the updated toolbar data,

    wherein ***the information associated with the toolbar data*** includes at least one member of a group comprising a revision level, version, time, date, user ID, account owner ID, PAP ID, IP address, session keys, billing data, name, address, account information, connection history, procedures performed by a user, group ID, e-mail address, e-mail ID, e-mail password, residential address, and phone number.

sarily associated one with the other by virtue of the nature of a database. In this context and based

on the evidence of record, it is reasonably certain that "the information associated with the toolbar data" refers to the "information associated with the one or more toolbar-defining databases." Defendant has failed to prove Claim 1 is indefinite.

There is no ambiguity in Claim 9, reproduced here with emphasis by the Court. The preamble recites "toolbar data stored in one or more toolbar-defining databases." This forms the antecedent basis for "the toolbar data stored in one or more toolbar-defining databases" found in each instance of an "information associated with the toolbar data stored in one or more toolbar-defining databases" term. Thus, it is clearly the "toolbar data" that is "stored in one or more toolbar-defining databases." Defendant has failed to prove Claim 9 is indefinite.

Accordingly, the Court determines that Defendant has failed to prove any claim is indefinite because of "the information associated with the toolbar data" limitation.

> 9. A method for dynamically modifying a toolbar using a remote source accessible through a network, wherein the toolbar is displayable on a user Internet device and includes one or more toolbar buttons that are defined by ***toolbar data stored in one or more toolbar-defining databases*** of the user Internet device, the toolbar data includes a plurality of toolbar button attributes associated with the one or more toolbar buttons of the toolbar, wherein at least one of the plurality of toolbar button attributes identifies a function to be performed by a specific toolbar button, the method comprising:
>
> > establishing a connection with a user Internet device, the connection invoked by the user Internet device;
> >
> > receiving, at the remote source, ***information associated with the toolbar data stored in the one or more toolbar-defining databases of the user Internet device***;
> >
> > determining, based on ***the information associated with the toolbar data stored in the one or more toolbar-defining databases of the user Internet device***, that the user Internet device should receive updated toolbar data; and
> >
> > sending, from the remote source via the network to the user Internet device, the updated toolbar data to be stored in the one or more toolbar-defining databases of the user Internet device, wherein the toolbar of the user Internet device is configured to receive the updated toolbar data, and to perform an operation that includes at least one member of a group comprising (a) and (b):
> >
> > > (a) updating the toolbar data to include at least one new attribute of the toolbar data to change the toolbar by adding a toolbar button to the toolbar; and
> > >
> > > (b) updating the toolbar data to modify an attribute of at least one of the one or more toolbar buttons of the toolbar,
> >
> > wherein ***the information associated with the toolbar data*** includes at least one member of a group comprising a revision level, version, time, date, user ID, account owner ID, PAP ID, IP address, session keys, billing data, name, address, account information, connection history, procedures performed by a user, group ID, e-mail address, e-mail ID, e-mail password, residential address, and phone number.

prove any claim is indefinite because of "the information associated with the toolbar data" limitation.

## IV. CONCLUSION

The Court adopts the constructions above for the disputed terms of the '070 Patent. Furthermore, the parties should ensure that all testimony that relates to the terms addressed in this Order is constrained by the Court's reasoning. However, in the presence of the jury the parties should not expressly or implicitly refer to each other's claim construction positions and should not expressly refer to any portion of this Order that is not an actual construction adopted by the Court. The references to the claim construction process should be limited to informing the jury of the constructions adopted by the Court.

**SIGNED this 9th day of September, 2017.**

ROY S. PAYNE
UNITED STATES MAGISTRATE JUDGE